ESTATE OF Olive D. CASEY, deceased; Carlton D. Casey, Executor, C. Lewis Casey, Executor, Robert T. Casey, Executor, Petitioners–Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.

No. 90–2052.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 4, 1991.

Decided Nov. 4, 1991.

Teresa Ellen McLaughlin, Tax Div., U.S. Dept. of Justice, Washington, D.C., argued (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Kenneth L. Greene, on brief), for respondent-appellant.

John E. Donaldson, Williamsburg, Va., argued, for petitioners-appellees.

Before PHILLIPS, Circuit Judge, CHAPMAN, Senior Circuit Judge, and KISER, U.S. District Judge for the Western District of Virginia, sitting by designation.

## OPINION

PHILLIPS, Circuit Judge:

■ The Commissioner of Internal Revenue (Commissioner) appeals a decision of the Tax Court that gifts of decedent Olive Casey's assets made during her lifetime by her attorney-in-fact were authorized by a durable power of attorney held by the attorney, hence were not revocable at the time of her death, and therefore were not includible in her gross estate for federal estate tax purposes.[1] Because we agree with the Commissioner that the Tax Court erred in finding the gifts authorized, hence not revocable, we reverse.

## I

As stipulated under the Tax Court's rules, the relevant facts are these.

Olive Casey (Olive) died testate, a resident of Virginia, in September of 1989. Until his death in June of 1982, she had been married to Carlton C. Casey (Carlton), and of this marriage there were three sons, Carlton D. Casey, C. Lewis Casey, and Rob-

ert T. Casey (Robert), all of whom survived Olive's death.

At the relevant times during the senior Casey's marriage, approximately 90% of their combined assets were held in Carlton's name. They consisted in substantial part of real estate owned by him, but in which under Virginia law Olive had a dower interest.

In 1962, 1968, and 1969, Carlton had conveyed parcels of this real estate, in equal shares, to the Caseys' three sons. Olive joined in these conveyances to release her dower interests.

In December of 1973, Olive executed a power of attorney appointing Robert her attorney-in-fact. The power of attorney was a "durable" one executed pursuant to then recently enacted Va.Code Ann. § 11–9.1. The principal feature of such a power of attorney—one not allowed by the common law—is that it is not revoked by the principal's disability, incompetence, or incapacity, but endures until her death unless revoked by the principal or a duly appointed guardian.[2]

This power of attorney authorized Robert, "to lease, sell, grant, convey, assign, transfer, mortgage and set over to any person, firm or corporation and for such consideration as he may deem advantageous, any and all of my property . . ." and "to accept and receive any and all consider-

---

1. Section 2038(a)(1) of the 1954 Code, which was in effect at all times relevant, provided that the gross estate includes property transferred by the decedent where the transferee's interest in the property is subject at the time of death to the decedent's power to revoke or alter that interest.

2. Section 11–9.1 of the Code of Virginia states:

    **When power of attorney, etc., not terminated by principal's disability; exception.**—Whenever any power of attorney or other writing, in which any principal shall vest any power or authority in an attorney-in-fact or other agent, shall contain the words "This power of attorney (or his authority) shall not terminate on disability of the principal" or other words showing the intent of the principal that such power or authority shall not terminate upon his disability, then all power and authority vested in the attorney-in-fact or agent by the power of attorney or other writing shall continue and be exercisable by the attorney-in-fact or agent on behalf of the principal notwithstanding any subsequent dis-

    ability, incompetence, or incapacity of the principal at law. All acts done by the attorney-in-fact or agent, pursuant to such power or authority, during the period of any such disability, incompetence or incapacity, shall have in all respects the same effect and shall inure to the benefit of, and bind the principal as fully as if the principal were not subject to such disability incompetence or incapacity. If any guardian or committee shall thereafter be appointed for the principal, the attorney-in-fact or agent shall, during the continuance of such appointment, account to such guardian or committee as he would otherwise be obligated to account to the principal. However, the guardian or committee shall have the same right and power, which the principal would have, in the absence of such disability, incompetence or incapacity, to revoke, suspend or terminate all or any part of the power and authority of the attorney-in-fact or agent if granted such power of revocation by the circuit court that appointed him in a proceeding to which the attorney-in-fact or agent was made a party.

ation payable to me on account of any such lease, sale, conveyance, transfer or assignment and to invest and reinvest the proceeds derived therefrom." And it followed this conferral of specific powers with the general power

> [t]o do, execute and perform all and every other act or acts, thing or things as fully and to all intents and purposes as I myself might or could do if acting personally, it being my intention by this instrument to give my attorney hereby appointed, full and complete power to handle any of my business or to deal with any and all of my property of every kind and description, real, personal, or mixed, wheresoever located and howsoever held, in his full and absolute discretion.

J.A. at 29–30. Critically for our purposes, the instrument nowhere expressly conferred any power "to make gifts," or "to convey with or without consideration," or the like.

In December of 1974, a year after Olive executed the power of attorney, Carlton embarked upon an estate plan designed to minimize his estate tax by taking advantage of the annual gift tax exclusion. From 1974 through 1977, following this plan, he made yearly transfers of property to the Caseys' three children and to seven trusts established for their grandchildren. Olive joined in these conveyances to release her dower interests, and filed gift tax returns consenting to being treated as having made one-half of each conveyance.

At some time between 1977 and 1980, Olive became incompetent to manage her affairs due to Alzheimer's disease, and she remained so until her death in 1989. Accordingly, when Carlton made additional conveyances of real estate to his estate plan donees in 1980 and 1981, Robert joined in their execution to convey Olive's dower interest, signing as her attorney-in-fact.

After Carlton's death in June of 1982, Robert, as attorney-in-fact for Olive, later that year transferred $14,000 to the estate plan donees, including himself, from Olive's bank account. And in 1983, in similar fashion he conveyed to the estate plan donees, including himself, real estate owned by Ol-

ive valued at $47,360, and transferred to the same donees $50,000 in cash from Olive's bank accounts.

In both 1982 and 1983, Olive had available income that exceeded the amounts required for her support. After the various gifts had been made by Robert, Olive had assets in excess of $426,000.

Following Olive's death in 1989, the federal estate tax return filed on behalf of her estate did not include in gross estate the gifts made by Robert as attorney-in-fact in 1982 and 1983. Taking the position that in the absence of an express grant of authority, a general power of attorney does not authorize gifts of a principal's assets by an attorney-in-fact, the Commissioner determined that Robert's 1982 and 1983 gifts were voidable transfers of Olive's assets. Accordingly, he concluded that they constituted revocable transfers includible in Olive's gross estate under § 2038(a)(1) of the IRC.

Upon the estate's petition in the Tax Court challenging the resulting deficiency assessment, that court rejected the Commissioner's position and held the gifts not includible in Olive's gross estate.

Looking to Virginia law as controlling on the issue, the Tax Court (Korner, J.) concluded that under that law, as it would be applied by the state's highest court, the gifts would be found authorized by the power of attorney. The court's analysis was brief. Conceding "the general proposition that broad, general language in a power of attorney should be carefully scrutinized," the court opined, however, that "a construction which faithfully reflects the intent of the grantor of the power is equally important." Believing that Virginia's highest court "would closely scrutinize the circumstances under which Robert Casey was granted the power of attorney," the court held that this would lead that court to the conclusion "that the power to make gifts to family members in order to minimize [estate taxes] and to carry out an established estate plan, was within the scope of the power granted." J.A. at 72–73. The court did not identify the particular power expressed in the instrument within whose scope it thought the specific pow-

er of gift would be found. Though it spoke in the plural of "circumstances" supporting such a finding, the only circumstance specifically identified by the court was Olive's having joined her husband, both before and after execution of the power of attorney, in making comparable gifts "in order to make use of the annual gift tax exclusion." The court summed up:

> Based on the broad grant of authority in the power of attorney itself and on the particular circumstances under which it was granted, as well as decedent's established pattern of giving, we hold that Robert Casey was authorized to make the gifts in question on the decedent's behalf.

J.A. at 73.

From the resulting decision disallowing the deficiency, the Commissioner took this appeal.

## II

The Tax Court rightly recognized that Virginia law controlled on the dispositive issue of the power of attorney's interpretation, *Morgan v. Commissioner*, 309 U.S. 78, 80, 60 S.Ct. 424, 425, 84 L.Ed. 1035 (1940), and that in the absence of direct Virginia authority on the point, it must seek to determine how Virginia's highest court would decide the issue, *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).

Following the same path, we conclude that the Tax Court erred in its determination that the Virginia Supreme Court would find the gifts in issue authorized by the power of attorney. We conclude to the contrary that the most relevant Virginia decisions dealing with the interpretation of powers of attorney in general and with the particular problem of self-dealing transactions by attorneys-in-fact point in the other direction.

### A

First off, we believe that the Virginia Supreme Court might well adopt, as a matter of policy, a flat rule that the unrestricted power to make gifts will not be found in any formally drawn, comprehensive, dura-

ble power of attorney that does not expressly grant it. Such a rule—which would make the gifts here revocable ones—would be but a special application of an assumption generally made in the interpretation of such instruments. As expressed in the *Restatement (Second) of Agency*:

> Formal instruments which delineate the extent of authority, such as powers of attorney ..., giving evidence of having been carefully drawn by skilled persons, can be assumed to spell out the intent of the principal accurately with a high degree of particularity. Such instruments are interpreted in light of general customs and the relations of the parties, but since such instruments are ordinarily very carefully drawn and scrutinized, the terms used are given a technical rather than a popular meaning, and it is assumed that the document represents the entire understanding of the parties.

*Id.* § 34, comment h.

A sister state in this circuit recently has adopted such a flat rule applicable to powers of attorney generally. In *Fender v. Fender*, 285 S.C. 260, 329 S.E.2d 430, 431 (1985), the Supreme Court of South Carolina, invalidating gifts by a familial attorney-in-fact, announced that "[i]n order to avoid fraud and abuse, we adopt a rule barring a gift by an attorney-in-fact to himself or a third party *absent clear intent to the contrary in writing*" (emphasis added).

When one considers the manifold opportunities and temptations for self-dealing that are opened up for persons holding general powers of attorney—of which outright transfers for less than value to the attorney-in-fact herself are the most obvious—the justification for such a flat rule is apparent. And its justification is made even more apparent when one considers the ease with which such a rule can be accommodated by principals and their draftsmen.

Virginia has not, so far as we are advised, adopted any such flat rule, else our task here would be quickly done. Neither, however, has it rejected such a rule, and we think there are significant intimations

in Virginia decisions interpreting powers of attorney and assessing the self-dealing conduct of attorneys-in-fact that strongly suggest the likely attractiveness of such a rule to that Court.

In the first place, the Virginia Court traditionally has construed powers of attorney narrowly in the terms of their conferral. As this court has noted, that court "strictly limits the authority of an agent to the letter of his instructions." *Eitel v. Schmidlapp*, 459 F.2d 609, 613 (4th Cir. 1972) (citing Virginia cases).

Limiting authority to the letter of an instructing document is, of course, most easily and confidently done by courts where the instrument is a formal and comprehensive one, with carefully enumerated specific powers. In such cases, as the quoted *Restatement of Agency* comment indicates, courts may indulge the ingoing assumption that the document "represents the entire understanding of the parties," and specifically that the failure to enumerate a specific power, particularly one with the dangerous implications of a power to make unrestricted gifts of the principal's assets, reflects deliberate intention. The power of attorney in issue here is of this type: formally drawn, comprehensive in its enumeration of specific powers, but with no gift-power expressly conferred. To adopt for such instruments a flat rule that gift power will not be found unless expressly conferred would be but a special application of Virginia's general approach of holding agents to the "letter of their instructions." *See, e.g., Southern Ry. v. Thomas*, 182 Va. 788, 30 S.E.2d 575 (1944) (holding to territorial limits).

The possible attractiveness of such a rule to the Virginia Court is further suggested by that court's traditional concern to protect principals against self-dealing by their attorneys-in-fact even where the specific conduct might be thought to lie within the letter of their general or specific instructions. To this end, the Virginia Court treats attorneys-in-fact as fiduciaries in respect of any self-dealing which benefits them and harms their principals, and applies to such transactions the presumption

of fraud generally applicable to self-dealing transactions by fiduciaries. *See Oden v. Salch*, 237 Va. 525, 379 S.E.2d 346 (1989) (course of self-dealing by holder of general power of attorney held presumptively fraudulent); *Creasy v. Henderson*, 210 Va. 744, 173 S.E.2d 823 (1970) (sale of asset to closely related third party for inadequate consideration by attorney-in-fact expressly authorized to "sell" held presumptively fraudulent and invalidated).

This of course is not a fraud case, and there is no suggestion of fraud in it. We accept without question the honorable intentions of the attorney-in-fact here. We look to these fraud cases only as they further suggest the possible attractiveness to the Virginia court of a flat rule against implying unexpressed powers of gift. For such a rule acts preventively to discourage the temptation to self-dealing by this means and thereby to forestall some destructive fraud litigation that otherwise would occur.

Every factor that suggests the attractiveness of such a flat rule for powers of attorney in general is increased where the power is a durable one. In conferring a non-durable power, a principal has the assurance that so long as it is in effect she will have the ability to protect herself against the exercise of particular powers even if expressly conferred, and that the power will not survive her incapacity so to protect her interests. The special quality of the durable power—that it survives incapacity—removes the most critical basis for that assurance, making post-capacity protection wholly dependent upon the care with which powers are expressly conferred in the instrument.[3] It makes special sense, therefore, to assume that such powers of attorney will have been drafted with particular care to enumerate expressly all the powers intended to be conferred.

### B

The Virginia Court may not be disposed to go so far as to adopt such a flat rule, even if confined to durable powers. If not, we believe that the court would nevertheless decline, looking to the complete text of

---

**3.** An added measure of protection if incompetency occurs is made possible by the wise provision in the durable power statute for the appointment of a guardian or committee for an

this particular instrument, and possibly to the circumstances of its execution, to infer in it a power, though unexpressed, to make the gifts here in issue.

■■■ The Virginia Court's traditional approach to interpreting such instruments is the approach generally taken by courts. The guiding principle is that in determining whether an attorney-in-fact has certain powers, courts should first seek the principal's intent as manifest in the instrument itself, and look to surrounding circumstances only to clarify ambiguity in the instrument. *See Hotchkiss v. Middlekauf,* 96 Va. 649, 32 S.E. 36 (1899).[4]

When one looks to the relevant language of the instrument here to discern Olive Casey's intent on the power at issue, the most powerful indicator of her intent is a glaring omission. Of the four principal purposes for asset transfer—sale, lease, mortgage, and gift—all but gift are expressly authorized, *in specific terms,* by the power of attorney. When one ponders the care with which this instrument enumerates these specific legal purposes for asset transfer, the omission of gift strongly suggests a positive intent rather than

oversight or any opposing intent with respect to that power. And when one considers the feature that distinguishes gift from all the other purposes—the lack of value in exchange—a validating reason for the omission is obvious. The omitted power of transfer by gift is by all odds the most potentially "dangerous" to any principal, hence, the one to be most cautiously inferred where not expressly granted. *See Restatement (Second) of Agency,* § 34 comment h.

The estate seeks to avoid the force of this critical omission by pointing to two instances of more general conferrals of power in the instrument that it claims should be interpreted to embrace gift-power. The first is the inclusion, along with the specific legal modes of asset transfer above noted, of the more general terms "grant, convey, assign, transfer, ... and set over." The other involves the use of traditional boiler-plate authorizations: to "do and perform all things and acts relating to my property ... which I might personally do," and even more generally—

(11) To do, execute and perform all and every other act or acts, thing or

---

incompetent principal who has executed a durable power. The attorney-in-fact thereupon becomes subject to the guardian's control just as he was to the principal's. *See, supra,* n. 2. Whether that post-incompetency protection will be made available in a particular case cannot of course be known at the time of execution of the instrument. So far as the record discloses, no guardianship was created for Olive following her incompetency.

**4.** The parties do not dispute that this is the general rule of interpretation that controls under Virginia law. They dispute only its proper application to the facts of this case. While each cites numerous cases from a number of jurisdictions arguably supporting the application for which each contends, none, predictably, is sufficiently close factually to serve as direct or immediately persuasive authority for decision in this case. Because the issue is so tightly factbound, we think no good purpose would be served by an exhaustive review of the cases cited. We think it fair to say, however, that in no case cited by the estate has a power of gift not expressly authorized in a durable power of attorney been inferred by a court either from broad boilerplate authorizations such as "to do all and every act whatsoever that I might," or from extrinsic circumstances, in a factual and litigation situation fairly comparable to this case. The estate's reliance is essentially on

cases in which after declining to infer such a gift, a court has implied in dictum that such a power *might* be inferred in appropriate circumstances, *e.g., Johnson v. Fraccacreta,* 348 So.2d 570 (Fla.App. 4th Dist.1977); *King v. Bankerd,* 303 Md. 98, 492 A.2d 608 (1985); or in which there was extrinsic evidence of an actual oral authorization for or consent by a principal to, a gift by an attorney-in-fact, *e.g., De Bueno v. Castro,* 543 So.2d 393 (Fla.App. 4 Dist.1989); *Estate of Linck,* 645 S.W.2d 70 (Mo.App.1982); or in which an attorney-in-fact or other agent was exonerated on a charge of fraud or breach of fiduciary duty in making a gift of his principal's assets, *e.g., Stacy v. Burke,* 259 Md. 390, 269 A.2d 837 (1970); *In re Estate of Lienemann,* 222 Neb. 169, 382 N.W.2d 595, 602 (1986); or in which a court had approved gifts by a courtappointed guardian after an adversary proceeding to determine the ward's best interests, *e.g., Lake v. Hope,* 116 Va. 687, 82 S.E. 738 (1914).

On the other hand, the Commissioner has cited numerous cases in which courts have declined to infer gift-powers not expressly authorized in powers of attorney despite the existence of broad authorizations to "do any and all acts and the like in the instrument, or of extrinsic circumstances that arguably suggested such an intent, *e.g., Fender v. Fender, supra; Johnson v. Fraccacreta, supra; In re Estate of Rolater,* 542 P.2d 219, 223–24 (Okla.App.1975).

things as fully and to all intents and purposes as I myself might or could do if acting personally, it being my intention by this instrument to give my attorney hereby appointed, full and complete power to handle any of my business or to deal with any and all of my property of every kind and description, real, personal or mixed, wheresoever located and howsoever held, in his full and absolute discretion.

As to the inclusion, along with the specific powers to sell, lease, and mortgage, of the more general powers to "grant, convey, assign, transfer, ... and set aside," the estate has two problems. First, this enumeration of specific and general powers of asset transfer is immediately qualified in its entirety by the phrase "for such consideration as [the attorney-in-fact] may deem advantageous." Second, it is followed by an express authorization to "accept and receive any and all considerations payable on account of any such lease, sale, conveyance, transference ... and to invest and reinvest the proceeds...." In combination, these two provisions suggest most strongly that the only asset transfer powers intended to be conferred by the enumeration of the specific and general powers were transfers for value.

■ As to the quoted general residual power in paragraph (11) of the instrument, there is a wise general rule of construction that we are satisfied the Virginia Court would follow. It is, in effect, that such expansive language should be interpreted as intended only to confer those incidental, interstitial powers necessary to accomplish objects as to which authority has been expressly conferred. *See Hotchkiss,* 32 S.E. at 37, 38 (language, "full power and authority to do and perform all and every act, ... as fully ... as I might ..." interpreted as not expanding powers beyond those expressly granted); *see also Brassert v. Clark,* 162 F.2d 967, 973 (2d Cir.1947) (L. Hand, J.) (to same effect); *Restatement (Second) of Agency,* § 37 comment a (1958) (same). We therefore do not believe that the Virginia Court would infer from this general language a power of gift nowhere expressly conferred, and whose omission indeed bears such strong marks of deliberate intent.

We think it most likely therefore that the Virginia Court, following its general rule of holding attorneys-in-fact to the letter of their instructions, would stop with the language of this instrument, finding no intrinsic ambiguity in it respecting gift power, but only a glaring omission to include such a power where its inclusion, if it had been intended, was most appropriate. On this basis, we believe that Court most likely would find the omission of a specific gift power in the power of attorney dispositive of the principal's intent on the subject, and hold the gifts here not authorized without resorting to any extrinsic circumstances for guidance as to the principal's intent.

■ If, however, the Virginia Court were for any reason to think it appropriate to look to extrinsic circumstances, we do not believe it would infer from those here an unexpressed intent to confer a power of gift. The estate argues essentially that because the gifts in issue simply carried forward a pattern of gifts for estate planning purposes in which Olive had joined both before and after execution of the power of attorney, her intent to authorize their continuation by her attorney-in-fact properly may be inferred from that fact. The Tax Court, as earlier noted, apparently agreed, citing Olive's pattern of gifts as the critical circumstance from which such an intent could be inferred. We disagree.

In the first place, none of Olive's "gifts" were gifts of her own property, but were simply joinders in conveyances to release dower interests. She then had no separate estate upon which she was solely dependent. Relatedly, her "gifts" were made under financial circumstances quite different from those obtaining at the time the gifts here in issue were made. Then her spouse, obviously the family provider, was alive, in control of the family's financial affairs, and responsible for her financial well-being. That was the situation when she executed the power of attorney. Her intent at that time (the critical time) has to be assessed therefore in light of her then necessary uncertainty about the continuation of that situation, the sequence of their deaths, and the continued competency of each to

manage their affairs. When that is done, the impropriety of inferring from any then-existing "pattern of giving" an intent to confer the power to continue such a "pattern" should her spouse predecease her and she become incompetent is obvious. If we assume, as seems appropriate under the circumstances, that when she executed the instrument she was acting on competent professional advice, we must assume that she was advised and acted with knowledge of all the relevant future contingencies, including the one that transpired. When that is done, the extrinsic circumstances attending the instrument's execution tend more to explain the omission of a gift-power as a deliberate one than to support any inference that such a power was intended though not expressly authorized.

■ Finally, in a number of ways the estate seeks to rely upon circumstances as they existed at the time of the gifts in issue as indicative of Olive's probable intent at the time she executed the instrument. The basic suggestion is that, as things developed, she would undoubtedly have approved of the gifts; that they did not threaten her ultimate financial security; that the attorney-in-fact acted honorably in the belief that the gifts were authorized; and that, fairly appraised, the gifts could be considered to be in Olive's "best interests."

The problem with all of this is that these facts, all of which may be assumed to be true, have only the most attenuated, if any, relevance to the dispositive issue of Olive's intent at the time of the instrument's execution. As the Virginia Supreme Court has put the matter in a related context, the judicial task in interpreting a will is to discern "what the testator meant by what he said, not by what it might be supposed he intended to say or should have said." *Aldridge v. First & Merchant's Nat'l Bank*, 191 Va. 323, 60 S.E.2d 905, 908 (1950). As the Commissioner points out, circumstances contemporaneous with the gifts by the attorney-in-fact might well have relevance in a guardianship proceeding seeking judicial authorization to make such gifts as being in an incompetent's best interests, but they are but marginally, if at all, relevant to the issue here.[5]

### III

Compelling policy considerations counsel great care by courts asked to infer powers not expressly authorized by powers of attorney. This is especially so when the power is a "dangerous" one such as a gift-power. And it may be even more so when the power of attorney is a durable one which survives a principal's personal ability to monitor its exercise. Where the instrument is a formal one, with comprehensively enumerated powers, the traditional rule that its author's intent is to be sought entirely in the language of the instrument unless ambiguity makes that impossible, is complemented by the rule that courts may properly assume that such an instrument expresses the principal's entire intent. In interpreting such an instrument, the issue is the principal's actual intent at the time of its execution, not what it might or should have been. This may or may not coincide with the best interests of, or justice to, particular parties affected by the instrument as circumstances later develop. When they do not coincide, remedy to avoid perceived injustice or to serve unanticipated interests should be sought elsewhere than in a departure from or wrenching of the traditional rules of interpretation. Their maintenance is necessary to predictability in the counseling and drafting of these important instruments and in litigation of disputes over their intended meaning.

In this case, all of these rules point away from finding in the power of attorney here in issue an unexpressed power to make gifts of this principal's assets. We believe that the highest court of Virginia, whose law controls on this issue, would in applying these basic rules so hold, and on that basis we so hold. By this we determine, contrary to the Tax Court's decision, that the gifts here in issue were revocable ones properly includible in Olive Casey's gross estate for estate tax purposes.

The decision of the Tax Court is reversed.

REVERSED.

5. *See, supra,* notes 2, 3.

KISER, District Judge, concurring:

I concur with so much of the majority opinion as holds that the Virginia Supreme Court would, in all probability, adopt a bright line rule which would require that the power to make gifts must be specifically set forth in the document creating a durable power of attorney. For this reason, I think it is appropriate to reverse the decision of the tax court. I write separately because part B of the opinion sets forth an alternative basis for this court's decision with which I do not agree.

Part B of the majority opinion undertakes to determine whether Olive Casey intended to grant the power to make gifts when she granted the power of attorney to her attorney-in-fact. In so doing, the majority weighs both the wording of the instrument, as well as the extraneous circumstances giving rise to the creation of the instrument. The tax court undertook a similar analysis. The majority finds that the wording of the instrument, together with the extraneous circumstances, does not justify the conclusion that the power of gift was conferred upon the attorney-in-fact. To the contrary, the tax court found that the intent of the principal was to grant to her attorney-in-fact the power of gift.

The determination of the intent of Olive Casey, principal, at the time she executed the durable power of attorney is a question of fact.

Because we are bound to review questions of fact on a clearly erroneous standard (*Hunt v. CIR*, 938 F.2d 466 (4th Cir. 1991)), I am not prepared to say that the tax court's finding that Olive Casey intended to grant the power of gift to her attorney-in-fact is clearly erroneous.